**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

> *Plaintiff-Appellee,*

v.

PIRATE INVESTOR LLC; FRANK
PORTER STANSBERRY,

> *Defendants - Appellants,*

and

AGORA, INCORPORATED,

> Defendant,

JAMES DALE DAVIDSON,

> Intervenor/Defendant.

No. 08-1037

FORBES, LLC; HEARST
CORPORATION; TRIBUNE COMPANY
(including the Baltimore Sun);
EAGLE FINANCIAL, INCORPORATED;
INVESTORPLACE MEDIA, LLC;
AMERICAN SOCIETY OF NEWSPAPER
EDITORS; CALIFORNIA FIRST
AMENDMENT COALITION;
RADIO-TELEVISION NEWS DIRECTORS
ASSOCIATION; REPORTERS
COMMITTEE FOR FREEDOM OF THE
PRESS; SOCIETY OF PROFESSIONAL
JOURNALISTS; THOMAS JEFFERSON
CENTER FOR THE PROTECTION OF
FREE EXPRESSION,

            Amici Supporting Appellants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(1:03-cv-01042-MJG)

Argued: December 2, 2008

Decided: September 15, 2009

Before WILLIAMS, Chief Judge,* and NIEMEYER and
MOTZ, Circuit Judges.

*Chief Judge Williams heard oral argument in this case but did not participate in the decision. The decision is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

Affirmed by published per curiam opinion.

## COUNSEL

**ARGUED:** Bruce D. Brown, BAKER & HOSTETLER, L.L.P., Washington, D.C., for Appellants. Michael Conley, UNITED STATES SECURITIES & EXCHANGE COMMISSION, Washington, D.C., for Appellee. **ON BRIEF:** Bruce W. Sanford, Lee T. Ellis, Jr., Laurie A. Babinski, BAKER & HOSTETLER, L.L.P., Washington, D.C.; Matthew J. Turner, Baltimore, Maryland, for Appellants. Brian G. Cartwright, General Counsel, Andrew N. Vollmer, Deputy General Counsel, Jacob H. Stillman, Solicitor, Mark Pennington, Assistant General Counsel, Rada L. Potts, Senior Litigation Counsel, SECURITIES & EXCHANGE COMMISSION, Washington, D.C., for Appellee. Walter Dellinger, Mark S. Davies, Allison Orr Larsen, O'MELVENY & MYERS, L.L.P., Washington, D.C.; Kai Falkenberg, Editorial Counsel, FORBES, L.L.C., New York, New York; Eve Burton, Jonathan Donnellan, THE HEARST CORPORATION, New York, New York; David S. Bralow, Assistant General Counsel, TRIBUNE COMPANY, East Coast Publishing, New York, New York; Lucy A. Dalglish, Gregg P. Leslie, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Arlington, Virginia; Kevin M. Goldberg, AMERICAN SOCIETY OF NEWSPAPER EDITORS, Arlington, Virginia; Kathleen A. Kirby, THE RADIO-TELEVISION NEWS DIRECTORS ASSOCIATION, Washington, D.C.; Robert M. O'Neil, Josh Wheeler, THE THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRESSION, Charlottesville, Virginia, for Amici Supporting Appellants.

4                    SEC v. PIRATE INVESTOR

## OPINION

PER CURIAM:

Frank Porter Stansberry and Pirate Investor LLC (collectively, "Appellants") offered and sold an e-mail stock tip. The offer and the tip contained representations that information in both documents was the product of conversations with a senior executive inside the company that was the focus of the tip. After conducting a bench trial, the district court concluded that the representations concerning the source of information in the e-mail stock tip were false, and it determined that Appellants had violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (West 2009), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2008), by offering and selling the stock tip. The district court ordered disgorgement of Appellants' profits from the sales of the stock tip, imposed civil penalties, and issued an injunction against future violations of Section 10(b) and Rule 10b-5.[1] Appellants argue that the facts of this case do not support the district court's finding of liability, and that the injunction against future violations of § 10(b) is overbroad. For the following reasons, we affirm.

I.

Pirate Investor LLC is a Maryland limited liability company that publishes investment newsletters.[2] Pirate also provides an e-mail service to its subscribers called the "Blast." Pirate is wholly owned by Agora, Inc., a Maryland corpora-

---

[1]"The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002). Accordingly, we will use "§ 10(b)" to refer to both the statute and the rule. *See SEC v. Wolfson*, 539 F.3d 1249, 1256 n.11 (10th Cir. 2008).

[2]We view the facts in the light most favorable to the prevailing party below, in this case the SEC. *See Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 590 (2001); *Taylor v. First Union Corp.*, 857 F.2d 240, 245 (4th Cir. 1988).

tion that publishes books, magazines, and newsletters covering a wide range of topics.[3] Stansberry is the editor-in-chief of Pirate, and in this capacity he writes and publishes investment newsletters.

Sometime in April 2002, Stansberry became aware of a company called USEC, Inc. USEC is a provider of uranium-enrichment services that began as an arm of the United States government.[4] The company currently is the executive agent of the United States government under a disarmament pact that was signed between the United States and Russia in 1993. Under the pact, known as "Megatons to Megawatts," Russia sells uranium that was formerly used in Soviet nuclear warheads to the United States for use as fuel in nuclear power plants. The pact further requires USEC and OAO Techsnabexport ("Tenex"), its Russian counterpart, to periodically renegotiate the price of the uranium. Any new pricing agreement is subject to approval by both the United States and Russian governments. The pricing agreement between USEC and Tenex expired at the end of 2001, and the two companies negotiated a new agreement in February of 2002. Neither the Russian nor the United States governments had approved this new agreement as of May 2002, however, and USEC requested that the United States government place the pricing agreement on the agenda for a summit between President George W. Bush and Russian President Vladimir Putin that was planned for that month.

After becoming aware of the circumstances surrounding USEC's pricing agreement, Stansberry contacted Steven Wingfield, USEC's Director of Investor Relations, and on May 2, 2002, conducted a telephone interview with Wing-

---

[3]Along with Stansberry and Pirate, Agora was an original defendant in the SEC's action. The district court rejected the SEC's theory that Agora, as the parent company of Pirate, was also liable for any wrongdoing committed by Stansberry and Pirate, and the SEC has not appealed that ruling.

[4]USEC was privatized in July of 1998.

field. This case revolves around two communications — a special report on USEC ("USEC Special Report") and a solicitation hawking that report ("Super Insider Tip E-mail") — that Stansberry prepared following that telephone conversation.

The Super Insider Tip E-mail was a promotional document calling on investors to "DOUBLE YOUR MONEY ON MAY 22ND WITH THIS 'SUPER INSIDER' TIP." (J.A. at 2972.) Specifically, the document purported to contain information obtained from "a senior company executive" that would allow investors to know exactly when "a major international agreement between the United States and Russia" would be concluded, resulting in substantial profits for a particular U.S. company. (J.A. at 2972.) The document identified May 22 as the day the deal would close and inveigled investors with assurances that "[t]his is the kind of insider information that could make you a lot of money." (J.A. at 2972-73.)

The Super Insider Tip E-mail also included some background on the company, as well as details of how the upcoming deal would benefit the company.[5] The document did not

---

[5]The e-mail also contained several flippant remarks. The e-mail's commentary on the nature of politics is particularly noteworthy:

> See how this works? It's a total insider deal. Money and favors in exchange for a fat deal with the Russians. Hey, I know it's dirty. But I don't make the rules and I don't run the company or involve myself in politics. On the other hand, I see nothing wrong with profiting from my insider knowledge of this deal and I don't think you should be ashamed to do so either.
>
> . . . .
>
> And guess what? The deal with the Russians has ALREADY BEEN SIGNED. That's right. It's all done, locked up. Finished. The only thing that both sides are waiting on is the proper media event to announce this commercial cooperation between the Ruskies and us. It's a feel good thing. It's PR for the politicians. You know how the game works.

(J.A. at 2974-75.) Despite the tip's suggestion that the author was also profiting from the information, "[a]t no time relevant to this case did Stansberry, Pirate Investor, or Agora own or trade in the stock of USEC." (J.A. at 124.)

provide the name of the company. For that nugget of information, investors were told that they would have to pay $1,000. Stansberry signed the e-mail under the pseudonym "Jay McDaniel."[6]

Those who responded to the Super Insider Tip E-mail and paid $1,000 would receive the USEC Special Report. This communication identified USEC as the company referenced in the Super Insider Tip E-mail. The USEC Special Report engaged in a financial analysis of USEC's fundamentals and discussed its role as the United States' agent under the 1993 disarmament pact. It observed that USEC had reached an agreement with its Russian partner regarding a market-based pricing agreement for nuclear fuel, but cautioned that "implementation of the agreement is subject to review and approval by the U.S. and Russian governments." (J.A. at 3111.) The USEC Special Report then repeated the claim made in the Super Insider Tip E-mail that: "A USEC senior executive has assured me that the new Russian agreement will be approved prior to the upcoming Bush-Putin summit. In fact, he said 'watch the stock on May 22nd.'" (J.A. at 3111.)

On May 13, 2002, Stansberry sent the Super Insider Tip E-mail to the Pirate Investor Blast Database, a list of e-mail addresses of subscribers to Pirate products. After an initial favorable response,[7] Stansberry caused the Super Insider Tip E-mail to be sent to numerous other electronic databases associated with Agora products, as well as at least one database that had no affiliation with Agora. Ultimately, over 800,000 individuals received the Super Insider Tip E-mail. Investors purchased 1,217 copies of the USEC Special Report, resulting

---

[6]In fact, "Jay McDaniel" was the pen name of Raymond Madron, an independent contractor for Pirate who wrote a weekly promotional piece advertising Agora products or services.

[7]One hundred seven USEC Special Reports were sold in the initial 24 hours after submission of the Super Insider Tip E-mail to the Pirate Investor Blast database.

in net proceeds of $1,005,000. Pirate received $626,500 of that sum.

Of course, what investors did not know, and what became the focus of the SEC's case against Stansberry and Pirate, was that Wingfield had never told Stansberry that approval of the USEC-Tenex pricing agreement would be announced on May 22.[8] Indeed, nothing was announced on May 22, and the pricing agreement was ultimately announced on June 19, 2002. On April 18, 2003, the United States Securities and Exchange Commission ("SEC") filed a civil complaint charging Agora, Pirate, and Stansberry with securities fraud under § 10(b) of the Securities Exchange Act of 1934. Following a bench trial, the district court concluded that Appellants violated § 10(b) by falsely claiming that a company insider provided the information in the Super Insider Tip E-mail and the USEC Special Report. Appellants were held jointly and severally liable for disgorgement of the profits of the scheme, plus prejudgment interest. Civil penalties were also imposed on Appellants, and the district court entered a permanent injunction enjoining them from further violations of § 10(b).[9] Appellants timely appealed, raising three issues: (1) whether the conduct in this case constituted a violation of § 10(b); (2) whether, if the conduct here does fall within the purview of § 10(b), the First Amendment entitles Appellants to the heightened protections it affords the media in other contexts; and (3) whether the permanent injunction entered by the district court is an improper prior restraint on speech.

---

[8]In the proceedings before the district court, Stansberry adhered to his claim that Wingfield did, in fact, suggest that approval of the pricing agreement would be announced on May 22. The district court found, however, that Wingfield made no such statements. Stansberry and Pirate do not challenge this particular factual finding on appeal.

[9]By order dated February 28, 2008, a panel of this court stayed the injunction pending appeal.

## II.

We begin with Appellants' claim that their conduct did not constitute a violation of § 10(b). In a civil enforcement action under § 10(b), the SEC must establish that the defendant "(1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities."[10] *McConville v. SEC*, 465 F.3d 780, 786 (7th Cir. 2006). The SEC bears the burden of establishing each element by a preponderance of the evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-91 (1983) (preponderance of the evidence standard applies to § 10(b) actions). We address each element in turn.

## A.

Section 10(b) requires that a defendant act deceptively in order to fall within the coverage of the statute. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473 (1977) ("The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception."). Deceptive acts include misstatements, omissions by those with a duty to disclose, manipulative trading practices, and deceptive courses of conduct. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 769 (2008). The facts of this case easily satisfy this element. The district court found that Wingfield never told Stansberry that approval of the pricing agreement would be announced on May 22, and the Appellants do not challenge that finding on appeal. Thus, Appellants' representations that they based their predictions

---

[10]Unlike private litigants, the SEC need not prove the additional elements of reliance or loss causation. *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993) ("The SEC need not prove reliance in its action for injunctive relief on the basis of violations of section 10(b) and Rule 10b-5."); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) ("Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money.").

on information obtained from a source within USEC were misstatements of fact.[11]

## B.

It is not enough, however, for the SEC to point to a false statement — the misrepresentation must concern a material fact. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) ("The plain language of Rule 10b-5 . . . requires any success-ful securities-fraud suit to allege a fact that is both untrue *and* material."). We have adopted the following standard for addressing materiality:

> [A] fact stated or omitted is material if there is a sub-

---

[11]On this point, we believe that the concerns raised by the *amici* are entirely illusory. The *amici* suggest that the district court premised its find-ing of liability on Appellants' claim that USEC's stock price would rise on a particular day — May 22 — and that such a prediction about a stock price change "is not an 'actual fact' but an 'opinion' that can never be a 'false' statement for purposes of the securities laws." (Amici Br. at 20.) This argument ignores the plain language of the district court's opinion, which clearly shows that the district court based its liability determination, not on the prediction itself, but on Appellants' claims that the prediction was the result of a conversation with a company insider:

> The Court finds that the SEC has established that the Super Insider Solicitation and the Special Report include actionable false statements — to the effect that the author was basing his statement as to a May 22, 2002 rise in stock price upon state-ments made to him by a senior executive of USEC in a position to know when the price agreement would be approved.

(J.A. at 158.) Claims regarding the source of information are not expres-sions of subjective opinion, but are representations of an objectively veri-fiable fact. *Cf. Miller v. Asensio & Co.*, 364 F.3d 223, 228 n.3 (4th Cir. 2004) ("The statements cannot be dismissed as unverifiable opinion; they set forth or were grounded in actual past or present facts, which Plaintiffs demonstrated to be false." (internal citation marks omitted)).

stantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

*Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999). Determining whether the facts of a particular case meet this standard "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Accordingly, we review for clear error the district court's determination, made after a bench trial, that Appellants' misrepresentations were material. *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 888 (9th Cir. 2008) (reviewing district court's findings on materiality for clear error); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 754 (11th Cir. 2007) (same); *Lawton v. Nyman*, 327 F.3d 30, 42 (1st Cir. 2003) (same); *SEC v. Maio*, 51 F.3d 623, 637 (7th Cir. 1995) (same).

Applying that standard, we see no clear error in the district court's finding of materiality. Appellants promised investors that the information they were receiving was the product of a conversation with a company insider. The materiality determination thus turns on whether the reasonable investor would treat a particular stock recommendation differently depending on whether or not the recommender was acting on inside information. We fail to see any clear error in the district court's determination that an investor *would* consider this question important in deciding whether to purchase the recommended security.[12] *Cf. Va. Bankshares, Inc. v. Sandberg*,

---

[12]Appellants' arguments on appeal fail to address this point. Rather, they attempt to find error in the district court's consideration of stock price evidence to support its materiality finding, because there was an abun-

501 U.S. 1083, 1090-91 (1991) (noting that statements by directors raise "no serious question" of materiality because directors "usually have knowledge and expertness far exceeding the normal investor's resources"). Moreover, purchasers of the USEC Special Report testified that it was important to them that the information conveyed in the report came from a source inside USEC, and that this characteristic influenced them to purchase the report and, subsequently, USEC stock. *See Harris v. Union Elec. Co.*, 787 F.2d 355, 366-67 (5th Cir. 1986) (finding no error in jury determination of materiality where the jury heard testimony from various purchasers and market experts); *Alton Box Board Co. v. Goldman, Sachs & Co.*, 560 F.2d 916, 922 (8th Cir. 1977) (noting the relevance of "testimony from sophisticated institutional purchasers that [omitted] facts would have been important to them"). In short, we find no clear error in the district court's conclusion that the misstatements in this case concerned material facts.

## C.

Next, we consider whether Appellants acted with the requisite intent, or scienter. "[T]he term 'scienter' refers to a men-

---

dance of positive information about USEC on the market during the time period that Appellants circulated the solicitation e-mail and special report. According to Appellants, it was the positive media attention that USEC was receiving that led to an increase in USEC's share price, not securities purchases by purchasers of the USEC Special Report. Thus, the argument goes, the district court should not have relied on this stock price evidence to conclude that the misrepresentations were material.

This argument misconstrues the district court's opinion. The district court's materiality finding was not premised on market data; the district court only looked to the market data surrounding USEC as an additional way of confirming that the statements were material. Even if the district court should not have attributed the increase in trading volume and share price of USEC stock after May 14 to Appellants' communications, given the self-evident materiality of a claim that one possesses inside information, the district court's ultimate conclusion still would not amount to clear error.

tal state embracing intent to deceive, manipulate, or defraud."
*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).
The SEC meets its burden of proving scienter by establishing
that the speaker acted intentionally or recklessly; the negligent
speaker, however, avoids liability. *Ottmann v. Hanger Ortho-
pedic Group, Inc.*, 353 F.3d 338, 343-44 (4th Cir. 2003).
Here, the district court determined that the SEC met its bur-
den of proving that Stansberry acted with the requisite intent,
and the court imputed Stansberry's scienter to Pirate.[13]

i.

In challenging the district court's scienter determination,
Appellants contend that the First Amendment protections rec-
ognized by the Supreme Court in *New York Times Co. v. Sul-
livan*, 376 U.S. 254 (1964), apply to this case. They claim that
the SEC needed to prove by clear and convincing evidence
that they acted with "actual malice." To support this claim,
they direct us to *Bose Corp. v. Consumers Union of United
States, Inc.*, 466 U.S. 485 (1984), a case involving the appli-
cation of the *New York Times* standard to a product disparage-
ment action.

In *Bose*, the Supreme Court was concerned with determin-
ing the proper standard of review for courts of appeals to
apply when confronted with a district court finding that a par-
ticular statement was made with the "actual malice" required
by *New York Times*. After determining that the Constitution
requires independent appellate review of "[t]he question
whether the evidence in the record in a defamation case is of
the convincing clarity required to strip the utterance of First
Amendment protection," *id.* at 510-11, the *Bose* Court moved

---

[13]Specifically, the court held that "Stansberry's scienter is imputed to
Pirate because he effectively controlled Pirate and made the statements at
issue on behalf of Pirate as an agent of Pirate, within the scope of his
agency." (J.A. at 170.) Pirate and Stansberry do not challenge this aspect
of the district court's decision.

on to a review of the facts of that case and noted that "the only evidence of actual malice on which the District Court relied was the fact that the statement was an inaccurate description of what [the defendant] had actually perceived," *id.* at 512. The *Bose* Court then held that the defendant's statement fell within the protections afforded by the First Amendment. *Id.* at 513.

Relying on the *Bose* Court's statement that "there is a significant difference between proof of actual malice and mere proof of falsity," *id.* at 511, Appellants argue that we cannot uphold the district court's resolution of the scienter issue because the district court "confused proof of falsity with proof of fault." (Appellants' Br. at 48.) They claim that there is no evidence in the record to support the district court's finding of scienter, absent the falsity of the claim that an insider provided the information on which they based the tip, and implore us to follow *Bose*'s lead by holding that an absence of additional evidence of intent necessarily means that the clear and convincing evidence standard mandated by *New York Times* has not been satisfied.

As we discuss elsewhere in this opinion, *see infra* Part III, we do not believe that the *New York Times* standard is applicable to this case. Thus, we reject Appellants' argument insofar as it relies on the mistaken belief that the SEC needed to prove intent by clear and convincing evidence, rather than under the preponderance of the evidence standard typically applicable to civil enforcement actions under § 10(b). Similarly, we reject the notion that independent appellate review of the district court's scienter determination is necessary under *Bose* and instead review the district court's finding that Appellants acted with scienter for clear error. *See Merchant Capital*, 483 F.3d at 766 (questions of scienter are reviewable under the clearly erroneous rule); *see also Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 618 (2d Cir. 1991) ("Matters of misrepresentation, knowledge, reliance, causation, and scienter

are questions of fact, and the trial court's findings as to those facts may not be set aside unless they are clearly erroneous.").

ii.

After reviewing the record, we are convinced that the district court's conclusion that Appellants acted with scienter was not clearly erroneous. The district court rested its conclusion on the circumstances surrounding the phone call between Stansberry and Wingfield. Having concluded that Wingfield did not, in fact, disclose to Stansberry that approval of the pricing agreement would be announced on May 22, the district court simply inferred that Stansberry, having been a party to that conversation, must have known that his claim that he had heard from a senior USEC executive that the announcement would occur on May 22 was false. The district court surmised that Stansberry "could not possibly have had a belief that the information he provided in the Super Insider Solicitation and Special Report was correct in all material respects" because he "knew full well that Wingfield had not told him that the pricing agreement would be announced on May 22." (J.A. at 170.)

We see nothing clearly erroneous about this conclusion. The district court did not premise its finding on the falsity of the statements, but on the fact that Stansberry was in a position to know whether or not his statements were true. As other courts have recognized, the fact that a defendant publishes statements when in possession of facts suggesting that the statements are false is "classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate."). Stansberry, having conducted the interview with Wingfield, would have known whether or not

Wingfield told him to "watch the stock on May 22nd." Once the district court found that Wingfield never made such a statement, there is nothing controversial in drawing the logical conclusion — that Stansberry would know that his claim was false.[14]

In addition, it would take an act of willful blindness to ignore the fact that Appellants profited from the false statements. Appellants surely knew that absent claims of insider knowledge, it is highly unlikely that investors would pay $1,000 for a stock recommendation. This inference is borne out by the emphasis that the solicitation e-mail placed on the "inside" nature of the tip as it encouraged investors to purchase the USEC Special Report. Given such a clear financial motive for the misrepresentations, the district court's conclusion that they were made with scienter is hardly surprising. The clear error standard of review demands something much more egregious than what confronts us here. *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988) ("To be clearly erroneous, a decision must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.").

## D.

Finally, we turn to § 10(b)'s fourth requirement, the "in connection with" requirement. Appellants claim that the fraud in this case did not make the necessary connection to securi-

---

[14]Appellants' only rejoinder to this point is to beat a retreat to more First Amendment case law by directing us to defamation cases where courts have been unwilling to find actual malice because the finding would depend on the resolution of a dispute between a source and a writer about what was said in a conversation. We do not find these cases relevant, however, as they appear to rest their holdings on the higher burden of proof applicable to defamation actions. The court in *Long v. Arcell*, 618 F.2d 1145 (5th Cir. 1980), for example, admitted that "[i]f the applicable burden of proof had been a preponderance of the evidence, a jury verdict either way would have to stand." *Id.* at 1148.

ties transactions because Appellants did not trade in USEC stock or breach any fiduciary duties. We disagree, and for the reasons discussed below we find no error in the district court's determination that Appellants committed fraud "in connection with" the purchase or sale of securities.

"The Supreme Court has consistently embraced an expansive reading of § 10(b)'s 'in connection with' requirement." *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008); *see also SEC v. Zandford*, 535 U.S. 813, 819 (2002) ("In its role enforcing the Act, the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'"). We construe the statute "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford*, 535 U.S. at 819 (internal quotation marks omitted). Under Supreme Court case law, fraudulent activity meets the "in connection with" requirement of § 10(b) whenever it "touches" or "coincides" with a securities transaction. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else."); *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971) (holding "in connection with" requirement satisfied where injury occurred "as a result of deceptive practices touching [a] sale of securities").

Of course, to say that a fraud is "in connection with" a securities transaction whenever it "coincides" with that transaction hardly clarifies the matter. We find direction in several factors that other courts have considered relevant when determining whether the "in connection with" requirement has been satisfied in a particular case. These factors include, but are not limited to: (1) whether a securities sale was necessary to the completion of the fraudulent scheme, *Zandford*, 535 U.S. at 820-21; (2) whether the parties' relationship was such that it would necessarily involve trading in securities, *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 302-03 (3d

Cir. 2005); (3) whether the defendant intended to induce a securities transaction, *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1221 (10th Cir. 2000), *aff'd*, 532 U.S. 588 (2001); and (4) whether material misrepresentations were "disseminated to the public in a medium upon which a reasonable investor would rely," *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000). Importantly, these factors are not mandatory requirements that a fraud must satisfy in order to meet § 10(b)'s "in connection with" requirement. They exist merely to guide the inquiry, and we do not presume to exclude other factors that could help distinguish between fraud in the securities industry and common law fraud that happens to involve securities. *See Zandford*, 535 U.S at 820; *see also Stoneridge Inv. Partners*, 128 S. Ct. at 771 ("Though § 10(b) is not limited to preserving the integrity of the securities markets, it does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way." (internal citations and quotation marks omitted)). Moreover, a fraud need not satisfy all of the factors to be "in connection with" a securities transaction; a close fit with one factor may well be enough for a fraud to result in § 10(b) liability. The application of the factors should be rooted in the understanding that the "in connection with" requirement is a flexible one and that questions concerning its scope are best examined on a case-by-case basis. *See Semerenko*, 223 F.3d at 175 (noting that "the scope of the 'in connection with' requirement must be determined on a case-by-case basis"); *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 942 (2d Cir. 1984) ("In cases near the borderline, courts have warned that '[i]t is important that the standard be fleshed out by a cautious case-by-case approach.'" (quoting *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 595 (5th Cir. 1974))).

i.

We first consider whether a securities transaction was necessary to the completion of the fraudulent scheme. In *Zand-*

*ford*, for example, the Supreme Court noted that the stock sales in that case were a fundamental component of the defendant's fraudulent scheme:

> [E]ach sale was made to further respondent's fraudulent scheme; each was deceptive because it was neither authorized by, nor disclosed to, the Woods. With regard to the sales of shares in the Woods' mutual fund, respondent initiated these transactions by writing a check to himself from that account, knowing that redeeming the check would require the sale of securities.

*Zandford*, 535 U.S. at 820-21. *See also Alley v. Miramon*, 614 F.2d 1372, 1378 n.11 (5th Cir. 1980) ("[T]he 'in connection with' test . . . is satisfied when the proscribed conduct and the sale are part of the same fraudulent scheme."); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 472 (D.N.J. 2005) ("[T]he only way for this scheme to succeed was for investors to purchase securities (shares of the defendant mutual funds).").

Appellants argue that the fraud in this case was complete when investors purchased the USEC Special Report because the $1,000 purchase price was the only material benefit that Appellants received. Under this theory of the case, Appellants derived no benefit from the purchasers' securities trading. They claim:

> [T]he alleged fraud was consummated and concluded when the Report was sold and the reader paid $1000. If there was a fraudulent scheme, no subsequent securities transactions were necessary to it, as neither the Publisher nor the Author derived any benefit from such trading. Indeed, the defendants would have committed fraud if not a single purchaser of the Report bought USEC shares, or if the Report named a fictitious company with a fictitious

ticker symbol, because they still would have 'defrauded' readers of the cost of the publication.

(Reply Br. at 9.) We believe that this is a rather short-sighted view of the fraudulent scheme and, taking the facts in the light most favorable to the SEC, we conclude that Appellants did benefit from securities trading by purchasers of the USEC Special Report.

First, Appellants' characterization of the fraud fails to recognize that Appellants used stock purchases by early purchasers of the USEC Special Report as a way of enhancing the credibility of the report. Over 800,000 investors received the Super Insider Tip E-mail that offered the USEC Special Report for sale, but they did not receive the solicitation at the same time. Rather, Appellants sent out the solicitation in waves to various groups of investors. And, later versions of the solicitation pointed to a rise in USEC's stock price — which the district court determined was the result of purchases by early recipients of the solicitation and special report — as supporting the trustworthiness of the tip.

When Stansberry first circulated the solicitation to the Pirate Investor Blast Database, on May 13, the solicitation noted that the stock was "only a $7.00 stock." (J.A. at 2979.) On May 17, however, Stansberry edited the solicitation e-mail to reflect a change in the stock's price. Future versions of the e-mail reflected the stock's updated price of $9.00 a share. Moreover, and most importantly, future versions of the solicitation e-mail used this jump in price as a selling point. The e-mail pointed out that the stock in question "has jumped this week and looks poised to go much higher," and quickly followed with an offer to sell the identity of the company for $1,000. (J.A. at 3034.) Thus, the rising stock was important to the success of the scheme because it served to motivate later purchasers to part with their requisite $1,000 payment. The fraud was not complete when investors paid $1,000 to learn the identity of the company in question; Appellants also

needed those investors to purchase the stock thereby increasing the stock price so as to boost the credibility of the solicitation e-mail to obtain more $1,000 payments.

These facts are similar to those that the Third Circuit faced in *Rowinski*. In that case, Salomon Smith Barney, a stock brokerage and investment firm, allegedly provided "research [that] was unlawfully biased in favor of the firm's investment banking clients, to the detriment of its retail brokerage customers." *Rowinski*, 398 F.3d at 296. Specifically, the plaintiffs alleged that Salomon Smith Barney systematically misrepresented the value of securities to investors who used the firm's retail brokerage services in order to "curry favor with investment banking clients and reap hundreds of millions of dollars in investment banking fees." *Id.* at 296-97. Seeking to avoid the provisions of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), which provides for the removal and federal preemption of certain state court class actions alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security," 15 U.S.C.A. § 78bb(f)(1)(A) (West 2009), the plaintiffs argued that the fraud in that case did not occur "in connection with the purchase or sale of a covered security."[15]

Much like Appellants' argument that the conduct in this case sounds in common law fraud, the plaintiffs in *Rowinski* argued that their complaint stated a "straightforward breach of contract claim, *i.e.*, Salomon Smith Barney agreed to provide

---

[15]While in *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005), the Third Circuit was considering the "in connection with" requirement in the context of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), its interpretation was tied to existing doctrine under § 10(b). *Rowinski*, 398 F.3d at 299; *see also Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1348 (11th Cir. 2008) ("'[I]n connection with the purchase or sale' of a security under SLUSA covers the same range of activities that the SEC could prosecute as violations of § 10(b) and Rule 10b-5."); *Siepel v. Bank of Am., N.A.*, 526 F.3d 1122, 1127 (8th Cir. 2008) (same).

unbiased investment research and failed to provide it." *Rowinski*, 398 F.3d at 300. The Third Circuit disagreed, observing:

> For this purported scheme to work, investors must purchase the misrepresented securities. Absent purchases by "duped" investors and a corresponding inflation in the share price, Salomon Smith Barney's biased analysis would fail to benefit its banking clients and, in turn, would fail to yield hundreds of millions of dollars in investment banking fees. The scheme, in other words, necessarily "coincides" with the purchase or sale of securities.

*Rowinski*, 398 F.3d at 302. In other words, the alleged fraud was not confined to the firm's representations to individual investors — the court realized that the stock purchases of investors who acted on that advice would lead to third parties, the companies, providing a benefit to the firm. Likewise, in this case Appellants used the inflation in the stock price caused by investors who purchased USEC stock in reliance on early versions of the USEC Special Report to influence third parties — investors who received the updated versions of the solicitation — to purchase copies of the USEC Special Report. Thus, securities transactions helped Appellants to maximize the profitability of their scheme.

In addition, the record shows that Appellants were not only relying on the rise in USEC's stock price to boost the credibility of this particular stock recommendation. They expected that the rise in USEC's price would lead to a general increase in Appellants' reputation as trusted purveyors of internet investment advice. The fraud's ultimate success involved not only the $1,000 purchase price, but also the boost in reputation that would accrue with those who purchased stock in reliance on the report — a reputational gain that would lead to future purchases of future reports on different companies. As Stansberry noted in an e-mail, "[i]f we're able to sell this to 250 people *and it works*, we'll be able to charge almost what-

ever we want next time." (J.A. at 3143) (emphasis added). In effect, Appellants' own definition of success depended on people purchasing securities in reliance on the report.

ii.

The next factor that we consider — whether the parties' relationship was such that it would necessarily involve trading in securities — weighs in favor of Appellants. Appellants sold investment advice; ultimately, the decision to purchase securities rested squarely with those who received the solicitation and USEC Special Report. In this respect, Appellants differ from the defendant in *Zandford*. In that case the defendant, a broker, possessed a general power of attorney — granted by his victims — allowing him to engage in securities transactions on their behalf. 535 U.S. at 815. The very purpose of the broker/investor relationship is trading in securities. *Rowinski*, 398 F.3d at 303. No such relationship existed in this case.

Indeed, we believe that the lack of a trading relationship serves to distinguish this case from one of the cases relied on by the SEC and the district court, *SEC v. Terry's Tips, Inc.*, 409 F. Supp. 2d 526 (D. Vt. 2006). Like Appellants, the defendant in *Terry's Tips* was an online financial advisor who made trading recommendations. *Id.* at 529. Significantly, however, the SEC's case against the defendant in *Terry's Tips* revolved around misrepresentations relating to the defendant's provision of auto-trading services. In an auto-trading arrangement, subscribers authorize an online financial adviser to direct trades on their behalf — the customers often are not aware of the trades until after they have already occurred.[16] In

---

[16]As explained by the court in that case:

Auto-trading is an investment vehicle in which subscribers to online investment newsletters open auto-trading accounts with brokerage firms, and authorize the online adviser to direct the trades in the subscribers' accounts. Auto-trading services are typically offered as an additional service provided by online finan-

24                 SEC v. PIRATE INVESTOR

such a scenario, the adviser is no longer merely a purveyor of information to investors who can choose to invest or not invest. Rather, in such a relationship investors explicitly delegate their decision-making authority to the online investment advisor; the parties' relationship becomes one that would necessarily contemplate trading in securities. The parties in this case contemplated no such arrangement.

iii.

The third factor we consider is whether Appellants made their misrepresentations with the intent to induce a securities transaction. *Compare United Int'l Holdings, Inc.*, 210 F.3d at 1221 (representations made with the purpose of inducing the purchase of an option are made "in connection with" the purchase or sale of a security), *and SEC v. Jakubowski*, 150 F.3d 675, 679 (7th Cir. 1998) (statements made directly to the issuer in order to induce the issuer to accept an offer to purchase satisfy the "in connection with" requirement), *with Ketchum v. Green*, 557 F.2d 1022, 1028 (3d Cir. 1977) ("in connection with" requirement unsatisfied where the purpose of the deception was not to cause a securities transaction). *See also Zandford*, 535 U.S. at 823-24 (noting defendant's secret

---

cial newsletters. The financial newsletters usually require subscribers to pay a fee to auto-trade in addition to the subscription fee paid to receive the general newsletter. The online adviser has arrangements with one or more broker-dealers that accept the adviser's auto-trading customers. The auto-trading customer sets up a brokerage account with a broker-dealer and executes a power of attorney or trading authorization authorizing the broker-dealer to automatically execute trades in the customer's account on instructions from the online adviser. Once the brokerage account is established, the online adviser sends specific trading instructions by e-mail or facsimile to the broker-dealer. These instructions are timed to take advantage of market events, and the customer usually learns of the trades only after they have been executed by the broker-dealer.

*SEC v. Terry's Tips, Inc.*, 409 F. Supp. 2d 526, 529-30 (D. Vt. 2006).

intent to keep the proceeds from sales of his client's stock); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (noting that defendant "intended to affect the market for [the] stock"). On this point we find no error in the district court's conclusion that "[t]he very essence of the fraudulent scheme was to induce its victims to purchase USEC stock prior to May 22, 2002 . . . ." (J.A. at 174.) We have already discussed how securities purchases by recipients of the misrepresentations would inure to the benefit of Appellants, and we believe that the text of the USEC Special Report itself forecloses any argument that Appellants did not intend for investors to purchase securities in reliance on the false statements.

The USEC Special Report, which, it bears repeating, Appellants sent to investors *after* those investors had parted with their $1,000, *repeated* the false claim that "[a] USEC senior executive has assured me that the new Russian agreement will be approved prior to the upcoming Bush-Putin summit. In fact, he said '*watch the stock on May 22nd.*'" (J.A. at 3111.) The report also called upon investors to "call your broker now and tell him to buy shares of USEC." (J.A. at 3109.) This raises the question: If, as Appellants claim, the misrepresentations were only intended to induce investors to purchase the USEC Special Report, why were they repeated in the report itself, which directly called investors to action? The record evidence compels the conclusion that Appellants intended the recipients of the solicitation and the USEC Special Report to trade in securities.

iv.

Finally, we turn to the factor that the district court primarily relied on in making its determination that the fraud satisfied the "in connection with" requirement — whether Appellants utilized a device "that would cause reasonable investors to rely thereon" and "so relying, cause them to purchase or sell a corporation's securities." *In re Carter-Wallace, Inc. Sec.*

*Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (internal quotations omitted). This standard is derived from a Second Circuit opinion, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc). In *Texas Gulf*, the Second Circuit held that "Rule 10b-5 is violated whenever assertions are made . . . in a manner reasonably calculated to influence the investing public . . . ." *Id.* at 862. Subsequent decisions have refined *Texas Gulf*, and several circuits now agree that:

> Where the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the "in connection with" requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission.

*Rana Research, Inc.*, 8 F.3d at 1362; *see also Wolfson*, 539 F.3d at 1262; *Semerenko*, 223 F.3d at 176.

Under the *Texas Gulf* standard, the SEC must establish two distinct elements: (1) the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely and (2) they were material when disseminated. *Semerenko*, 223 F.3d at 176. We have already considered whether the misrepresentations in this case were material. Here, we focus our attention on the first element of *Texas Gulf*. The SEC must show that reasonable investors would base their investment decisions on the *types* of communications at issue in this case — mass e-mails from a purveyor of internet investment advice.[17]

(Text continued on page 28)

---

[17]Appellants claim that the *Texas Gulf* standard only is relevant when evaluating communications occurring in a particular context — specifically, statements made in corporate communications from issuers to investors. They argue: "The reasonableness standard of *Texas Gulf* is tied to fiduciary duty." (Reply Br. at 11.) And, because they claim that no fiduciary duty runs between a publisher of an investment newsletter and its

readers, Appellants submit that the *Texas Gulf* standard cannot properly apply to this case.

Courts, however, have not applied *Texas Gulf* so narrowly. In *Rana Research, Inc.*, for example, an individual interested in acquiring a publicly traded company disseminated a press release falsely claiming that there was a "firm offer" to purchase the company's shares at a certain price, even though the company's president, who was also a major stockholder, had communicated that the company had no interest in being acquired in a buyout. 8 F.3d at 1360. The potential purchaser had hoped to use the press release as a way of pressuring the company's president to present the offer to the board of directors. *Id.* The Ninth Circuit held that those facts satisfied the "in connection with" requirement, though the potential purchaser owed no fiduciary duty to shareholders of the company. *Id.* at 1362-63.

Similarly, in *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000), the Third Circuit applied *Texas Gulf* to statements made by one company that affect the stock price of a different company. In that case American Bankers Insurance Group, Inc. was the subject of competing tender offers by AIG and Cendant Corp., and Cendant overstated its income in forms it filed with the SEC in conjunction with its tender offer. *Id.* at 170. The Third Circuit held that the *Texas Gulf* standard applied to claims that purchasers of ABI stock brought against Cendant. *Id.* at 176. *Texas Gulf* applied even though Cendant owed no fiduciary duties to purchasers of ABI stock. Accordingly, we see no requirement that we limit application of the *Texas Gulf* standard only to statements made in the context of a fiduciary relationship.

We do believe, however, that whether such a relationship exists is relevant to the question of whether a particular communication meets the *Texas Gulf* standard in a particular case. The standard does ask, after all, whether misrepresentations have been disseminated in a medium upon which a *reasonable* investor would rely, and we think it rather self-evident that documents created and dispersed by fiduciaries are more likely to meet the *Texas Gulf* threshold, and thus satisfy the "in connection with" element of § 10(b), than those that are not. On this point we agree with the following observation by the Second Circuit:

> [W]hen the fraud alleged is that the plaintiff bought or sold a
> security in reliance on misrepresentations as to its value, made by
> a defendant whose position made it reasonable for the plaintiff to
> rely on the representation and imposed some duty on the defen-

At first glance, we question whether any reasonable investor would rely on the Super Insider Tip E-mail.[18] As we noted above, the *Texas Gulf* standard encompasses "press release[s], annual report[s], investment prospectus[es] or *other such* document[s]." *Rana Research, Inc.*, 8 F.3d at 1362. Courts have applied this standard, for example, when misrepresentations are disseminated in investment research reports from a reputable broker, *see Rowinski*, 398 F.3d at 302; prospectuses, *see In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616, 628 (D.N.J. 2005); the sales and marketing materials at brokerage houses and other points of sale, *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 342, 355 (W.D. Pa. 2005); SEC filings, *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-266-B, 2004 U.S. Dist. LEXIS 20733, at *15-16 (D.N.H. 2004); and detailed drug advertisements published in sophisticated medical journals, *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d at 156. Clearly, the communications at issue in the

---

dant to be honest or to disclose information, then whatever problems there may be with the case, a connection between the fraud and the transaction should not be one of them.

*In re Ames Dep't Stores, Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir. 1993).

[18]The record contains scant evidence on this point, but what little information is in the record suggests that reasonable investors would not rely on the communication at issue. For example, the SEC cross-examined one of Stansberry's experts, David Nelson, regarding one of the texts that Nelson relied on when preparing his report. The SEC presented the following excerpt:

Essentially critics of the investment letters have argued that the advisers are ignorant, they may have no formal experience or education in investment, incompetent, their investment record can be bad, dishonest, they can lie about their records, jerks, all of which can be true.

(J.A. at 1212.) Other statements from the text that the SEC pointed to include "Investors newsletters accurate as a coin flip" and "Their advice was no better than throwing a dart at the stock quotes page of the Wall Street Journal and buying whatever it hits." (J.A. at 1215-16.)

present case have little in common with the types of communications that have heretofore led to liability under the *Texas Gulf* standard. *Cf. SEC v. Benson*, 657 F. Supp. 1122, 1131 (S.D.N.Y. 1987) (registration statements and annual and quarterly reports are clearly the types of documents that investors rely on). In fact, we feel confident that a reasonable investor would not base investment decisions on mass e-mail communications such as these — which the SEC's attorney characterized as SPAM during oral argument — that purport to offer a stock tip based on insider information.

Thus, at first blush, it would appear that this factor weighs in favor of Appellants' arguments. We fear, however, that applying the *Texas Gulf* standard to remove Appellants' fraud from coverage under § 10(b) would neglect the reasoning behind the *Texas Gulf* standard. At its core, the *Texas Gulf* standard is about notice — attaching liability under the securities laws for statements made in any medium, no matter how tangentially related to the securities markets, would run the risk of roping in speakers who had no idea that their conduct might implicate Section 10(b). Thus, by requiring that misstatements be communicated in a medium upon which a *reasonable* investor would rely, the *Texas Gulf* standard protects these unknowing speakers from liability and ensures that there is a sufficient nexus between the misrepresentations and the securities sales that they induce to satisfy the Supreme Court's command that the fraud and securities sales "coincide."

This case simply does not implicate the notice concerns that animate the *Texas Gulf* standard. To the contrary, Appellants knew that recipients of the solicitation and USEC Special Report would rely on them when making their investment decisions. After all, Appellants did not target the public at large when they circulated the solicitation e-mail. Rather, Appellants circulated the e-mail solicitation to investors on the specific subscriber lists of internet investment newsletters. These were investors who trusted internet investment advice

— Appellants certainly should not have been shocked to learn that their fraudulent statements induced securities transaction. Under these circumstances, an application of the *Texas Gulf* standard to exclude the communications would run contrary to § 10(b)'s core purpose — "to protect investors, to prevent inequitable and unfair practices and to insure fairness in securities transactions generally." 3 Fletcher Cyc. Corp. § 900.65 (perm. ed. 2002). Although ordinary reasonable investors might well have taken one look at Appellants' solicitation and marked it for the SPAM box, Appellants *knew* that they were directing their misstatements to particular investors who *did rely* on internet investment advice. We believe that this knowledge supports finding that the misstatements occurred "in connection with" securities transactions.[19] *See SEC v.*

---

[19]On this point we take direction from the common law's treatment of the materiality standard. Under the common law, a representation may be material, even if a reasonable man would disregard it, if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." Restatement (Second) of Torts § 538(2)(b) (1977). As the comments to the Restatement explain:

> Even though the matter misrepresented is one to which a reasonable man would not attach any importance in determining his course of action in the transaction in hand, it is nevertheless material if the maker knows that the recipient, because of his own peculiarities, is likely to attach importance to it. There are many persons whose judgment, even in important transactions, is likely to be determined by considerations that the normal man would regard as altogether trivial or even ridiculous. *One who practices upon another's known idiosyncrasies cannot complain if he is held liable when he is successful in what he is endeavoring to accomplish.*

*Id.* cmt. f (emphasis added). While we do not suggest that the Restatement's treatment of materiality controls our analysis of § 10(b)'s "in connection with" requirement, we do note that the Supreme Court often turns to the Restatement to inform its jurisprudence on these issues. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344 (2005); *Wharf (Holdings) Ltd.*, 532 U.S. at 596. Moreover, and more importantly, we believe the above principle to be a sound one — Appellants have little room to complain that their conduct has implicated § 10(b) when they knew that readers would rely on the communications and they actively encouraged them to do so.

*Park*, 99 F. Supp. 2d 889, 900 (N.D. Ill. 2000) ("[F]raud in the sale of investment advice may qualify as 'in connection' with the sale of securities when it is expected that the advisees will act on the advice." (citing *R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 172-73 (5th Cir. 2000)).[20]

v.

As our previous discussion shows, there are at least three reasons to conclude that the fraud in this case occurred "in connection with" the purchase or sale of securities. First, record evidence supports a conclusion that securities purchases were necessary to complete Appellants' fraudulent scheme. Second, such evidence supports the district court's finding that Appellants made their misrepresentations with the intent to induce securities transactions. And, third, Appellants directed the misrepresentations to investors that they knew were likely to rely on them. Given these characteristics, the application of § 10(b) is not barred by the fact that there was no securities trading relationship between the Appellants and the recipients of the e-mail misrepresentations.

Appellants, however, joined by *amici*, argue that our treatment of the "in connection with" requirement raises First Amendment issues: "As applied in the way the SEC now urges, § 10(b) would not be restricted to the statements of fiduciaries or those who trade in stocks, but would cover *all* statements about securities by anyone who cared to speak to anyone who cared to listen." (Appellants' Br. at 33.) The great concern is that publishers of financial news and commentary will face potential liability under § 10(b) and that this will

---

[20]Our conclusion here does not imply that an individual investor in this case would be able to demonstrate that he "justifiably relied" on the Super Insider Tip E-mail as required to establish a securities violation in a private suit. *See Miller v. Arsenio & Co., Inc.*, 364 F.3d 223, 227 (4th Cir. 2004). Although the two types of reliance may share some similarities, it would not be appropriate to import wholesale our "reasonable reliance" analysis into a "justifiable reliance" analysis required in a private suit.

chill publishers' attempts to report on financial matters. The *amici*, in particular, point out that financial news and commentary is especially important because so many Americans are actively involved in trading in the securities markets and there is a high demand for information about investment opportunities. Appellants and the *amici* argue that these constitutional concerns require that we interpret § 10(b)'s "in connection with" requirement narrowly, and they suggest that we can do so by recognizing an exception from the coverage of § 10(b) for publishers of nonpersonalized financial news and commentary who do not possess a financial interest in the securities that they discuss.

To support this claim, Appellants direct us to *Lowe v. SEC*, 472 U.S. 181 (1985). In *Lowe*, the Supreme Court faced the question of whether the petitioner, who had been convicted of various offenses involving securities, could be permanently enjoined from publishing securities newsletters because he had not registered as an investment adviser under the Investment Advisers Act of 1940. That Act defines an investment adviser as, and thus requires registration for, "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . ." 15 U.S.C.A. § 80b-2(a)(11) (West 2009). The Court conceded that the petitioner's activities fell within this definition, but noted that Congress, expressing its recognition of the serious First Amendment problems implicated by a law requiring registration of the press, *see Lovell v. City of Griffin*, 303 U.S. 444 (1938), included a statutory exception for "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation," § 80b-2(a)(11)(D). *Lowe*, 472 U.S. at 203-05. The Court, noting that First Amendment concerns "support[ed] a broad reading of the exclusion for publishers," concluded that the petition-

er's newsletters were "described by the plain language of the exclusion" and were thus exempt from coverage under the Investment Advisers Act. *Id.* at 205-06, 211.

Appellants argue that the canon of constitutional avoidance, which compelled the Supreme Court to read broadly the exception for publishers in the Investment Advisers Act, likewise requires that we *create* a new exception for disinterested publishers from the coverage of § 10(b) of the Exchange Act. The district court rejected this argument by reasoning that, even if there were an exception from § 10(b) for such publishers, Appellants could not invoke the exception because the Super Insider Solicitation and the Special Report were not publications "of regular and general circulation," as the *Lowe* Court interpreted those terms. While we do not agree with its reasoning, we do agree with the district court's ultimate conclusion — that Appellants fall within the coverage of § 10(b).[21] The district court's ultimate conclusion was correct because, quite simply, the text and purpose of § 10(b) admit of no exclusion for "disinterested publishers" of financial news and commentary, thus rendering constitutional avoidance arguments irrelevant.

The canon of constitutional avoidance is "a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). The

---

[21]The "regular and general" requirement relied upon by the district court is a statutory requirement for exclusion under the Investment Advisers Act — it is a representation of how Congress chose to accommodate First Amendment concerns with respect to that particular Act. Appellants argue that, in the § 10(b) context, First Amendment concerns compel an exemption for disinterested publishers regardless of whether the publications are "regular and general." By holding that Appellants were not entitled to an exemption because the publications were not "of regular and general circulation," the district court failed to recognize that such regular and general circulation is not a requirement for the exemption Appellants seek.

canon is a tool of limited purpose, however. As the Court quite recently explained: "The canon of constitutional avoidance does not supplant traditional modes of statutory interpretation. We cannot ignore the text and purpose of a statute in order to save it." *Boumediene v. Bush*, 128 S. Ct. 2229, 2271 (2008) (citations omitted). Accordingly, we utilize the canon "only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them*." *Clark*, 543 U.S. at 385. If traditional modes of statutory construction sufficiently resolve the issue, then, there is no need to reach deeper into our toolbox. And, in this case, we believe that ordinary principles of statutory construction foreclose the argument that we can interpret § 10(b) to include an exception for disinterested publishers.

The first step in any case of statutory interpretation is to consider the language of the statute in order "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "When the words of a statute are unambiguous, . . . this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 462 (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). Thus, we must first consider the text of § 10(b), and Appellants direct us to the "in connection with" requirement, claiming that the requirement is "exactly the sort of loose, ambiguous language that must be confined to avoid constitutional concerns." (Appellant's Br. at 34.)

We are mindful, however, that "statutes are not read as a collection of isolated phrases." *Abuelhawa v. United States*, 173 L. Ed. 2d 982, 987 (2009). Looking to the entire statute, § 10(b), by its plain language, applies to *any person*. In this respect, § 10(b) is wholly different from the statute the Supreme Court interpreted in *Lowe*, where the Supreme Court used First Amendment concerns in interpreting an *already*

*existing* exception broadly. Section 10(b) excepts no one from its reach, and the *Lowe* Court recognized that the statute constitutes a backstop against fraudulent activity — even those publishers otherwise excepted from the provisions of the Investment Advisers Act remained subject to the coverage of § 10(b). *See Lowe*, 472 U.S. at 209 n.56. Thus, we find Appellants' reliance on *Lowe* unpersuasive, because § 10(b) includes no exceptive language of the type that the Supreme Court interpreted in that case.

Even if we focus solely on § 10(b)'s "in connection with" language, we note that Congress intended the requirement to be flexible. Indeed, the Supreme Court has described § 10(b) as "a catchall clause to enable the Commission to deal with new manipulative or cunning devices." *Hochfelder*, 425 U.S. at 203 (internal quotation marks and alterations omitted); *see also United States v. Russo*, 74 F.3d 1383, 1390 (2d Cir. 1996) ("The purpose of the Section and its implementing regulations is to prevent fraud, whether it is 'a garden type variety of fraud, or present[s] a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.'" (quoting *Bankers Life & Cas. Co.*, 404 U.S. at 11 n.7)). It necessarily must be applied to radically different and ever-evolving sets of facts, and that goal is accomplished by interpreting the statute flexibly.[22] Thus, Appellants' reliance on any ambiguity in the phrase "in connection with" as a reason to employ the canon of constitutional avoidance fails

---

[22]For example, while originally directed at preventing buyers and sellers of securities from deliberately misleading each other for the purpose of inducing a transaction, *see SEC v. Tambone*, 550 F.3d 106, 122 n.20 (1st Cir. 2008), § 10(b) now covers a variety of fraudulent activity, including insider trading, *see, e.g.*, *Chiarella v. United States*, 445 U.S. 222, 228-29 (1980); a broker's theft of the proceeds from sales of his clients' securities, *Zandford*, 535 U.S. at 822; misstatements by accountants who know that their communications will be communicated to investors, *see Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225-27 (10th Cir. 1996); and even a company's false advertisements in medical journals, *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156-57 (2d Cir. 1998).

in light of the statute's purpose — providing a flexible regime for addressing new, perhaps unforeseen, types of fraud. Creating a blanket exception for "disinterested publishers" hardly seems consistent with this purpose, and the Supreme Court has required that we avoid "technical[ ] and restrictive[ ]" interpretations of the statute. *Zandford*, 535 U.S. at 819 (internal quotation marks omitted).

## E.

To conclude our discussion of § 10(b), we find the district court correctly found that Appellants' conduct constituted a violation of the statute. Appellants made misrepresentations of a material fact — whether an insider had provided the information in the stock tip — and Appellants did so with the requisite scienter. Moreover, the misrepresentations were "in connection with" securities transactions because securities transactions were necessary to maximize the fraudulent scheme, Appellants made their misrepresentations with the intent that investors would rely on them, and Appellants knew that investors would so rely. This conduct violates § 10(b), and Appellants cannot avoid application of the statute by invoking constitutional concerns because the text and purpose of § 10(b) admit of no exception for "disinterested publishers."

## III.

We next consider Appellants' argument that, even if their conduct fell within the coverage of § 10(b), the Super Insider Tip E-mail and USEC Special Report constitute speech entitled to some measure of First Amendment protection. Admittedly, our conclusion that constitutional concerns do not compel an exclusion from § 10(b) for Appellants' conduct does not answer this question. The canon of constitutional avoidance is a method of statutory interpretation, not a way of adjudicating constitutional issues. Defendants remain free to bring constitutional challenges to a statute as applied to

their conduct, and in this case Appellants argue that the district court should have found that the Super Insider Tip E-mail and USEC Special Report were entitled to the heightened protections for expression that the Supreme Court recognized in *New York Times Co. v. Sullivan*, because the SEC sought to impose liability on the basis of "pure expression" — Appellants' recommendation of USEC stock. Under this theory the SEC should have borne the burden of proving by clear and convincing evidence that the statements were published with "actual malice," and we would have to engage in an independent review of the record in order to ensure that the SEC met that burden. According to Appellants, the Constitution requires that we recognize these protections whenever we impose liability on the alleged falsity of a publication.

We cannot agree with Appellants. Punishing fraud, whether it be common law fraud or securities fraud, simply does not violate the First Amendment. The Seventh Circuit has articulated this principle in *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 992 (7th Cir. 2000), explaining: "Laws directly punishing fraudulent speech survive constitutional scrutiny even where applied to pure, fully protected speech." The Supreme Court has stated the principle almost as directly: "[T]he First Amendment does not shield fraud." *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003). Of course, the government cannot label certain speech as fraudulent so as to deprive it of its constitutional protections, *id.* at 617, but we need not worry about such strategic labeling here because § 10(b) clearly forbids actual fraud. Thus, Appellants' First Amendment argument fails.

IV.

For this same reason, Appellants' challenge to the district court's issuance of an injunction permanently enjoining them from violating § 10(b) also fails. The injunction does not constitute an unlawful prior restraint because it only enjoins

Appellants from engaging in securities fraud, which we have held is unprotected speech.[23]

## V.

In conclusion, for the reasons stated above, the judgment of the district court is

*AFFIRMED*.

---

[23]Appellants also argue — but only in their reply brief — that the injunction is a disfavored "obey the law" injunction, because the injunction merely tracks the language of § 10(b) and Rule 10b-5 in describing the prohibited conduct. Federal Rule of Civil Procedure 65(d) requires that injunctions "describe in reasonable detail . . . the act or acts restrained or required," and several circuits have relied on Rule 65(d) to require that injunctions do more than instruct a defendant to "obey the law." *See, e.g.*, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897-98 (5th Cir. 1978). Ordinarily we do not consider arguments raised for the first time in a reply brief, and we find no reason to depart from that rule in this case. *See A Helping Hand LLC v. Balt. County*, 515 F.3d 356, 369 (4th Cir. 2008).